Battle, J.
Tbe petitioner was, prior to tbe 2j6th day »f April, 1864, a Lieutenant in tbe army Of tbe Confed-* erate States ; but by an order of that date, be was dropped' from .tbe roll as an officer. • At tbe August Term, 1864, of tbe Court of Pleas and Quarter sessions for tbe county of Hyde, he was elected Register of tbe county, and was duiy qualified as such by entering into bond and taking tbe necessary oaths. Subsequently, to wit: on tbe 22d óf .September, 1864, be was ordered as a conscript, by tbe enrolling officer of the'county, to-report himself without delay to the camp of instruction, near Raleigh. The date óf enrollment is not distinctly specified either in the petir tion or return, though it is strongly tó be inferred from the allegations of the petitioner, that it was prior to his election as Register. That, however, I consider as immaterial, because I think that under the army regulations he was in the 'military .service as a private, as soon as he was dropped from the rollas an officer. See Army Regulations. .
It is agreed by the counsel that a Register., of a county is a civil officer of the State ; and that the Governor had claimed the petitioner as an exempt from military service in the army'of the Confederate States.
TJpen this statement of facts, it is contended by the counsel for the petitioner, first, that he is entitled to a discharge from custody upon a just construction of the second paragraph of the'IOth section of the act of Congress,, ratified on the 17th day .of February, 1864, though he was in the military service when he was elected Register of Nyde county. Secondly, if that be not. so, that-after his' election and-qualification as a civil officer of the State, he became exempt from any further- service in the army of the Confederate States, because.Congress has no power to *114 restrict the State in the selection of. any of its citizens, ■whether in or out of the army, to fill any office necessary to the’action of the government;- I differ from the counsel as to the correctness of his position, and will pro-need to state, as well as I can, the reasons upon which my opinion is founded:
1st. In ascertaining and settling the construction of the military act of February, 1864, it is proper to avail ourselves of any light which may be thrown upon the subject by any statute, in pari materia, particularly if it were passed about the same time. 1- Black. Com., 60.
It appears from the act of Congress, approved the 5th ■ day of January, 1864, cuiitled “an -act to put an end to. the exemption from military service of those who have heretofore furnished substitutes,” that the country was 'then in very great need of soldiers. The preamble recites that — “ Whereas, in the present circumstances of the country, it requires the aid of all who are able to bear arms., the Congress of the Confederate States do enact,”' &c. This most pressing want of the Confederate government is, if possible, still more strongly shown in the act 9 under consideration. It repeals -all former laws whieh granted exemptions* and thus at once sweeps away the long list of exempts which may be found in'the act of October, 1862. It enlarges the ages of conscripts from 18 •and 45 to 1.1 and 50., thus calling into the field of active service boys and old men. ...It takes from their homes almost every person capable of bearing- arms, except those officers who aré necessary to the proper administration of the Confederate and State governments, and a few others who were deemed necessary to carry on the educational, • •industrial and other indispensable pursuits of the country, with the addition of a still fewer number who are re-. *115 strained from bearing arms by religious scruples. With tbis most urgent, pressing-demand for soldiers for the de-fence of the country in its life and death struggle for national existence,.placed thus prominently before us, have we a right to infer that Congress intended, by the exemptions which it granted in the act of February, 1864, to release from further service in the army any soldier whom it had a right to retain there? Tt séems to me to be ignoring the whole spirit, of the act to suppose so. 1 cannot come to any such'conclusion, unless I find it so declared by the express terms of the act.
So far from finding any express declaration in the act to that effect, .the terms of exemption may .be fully satisfied by confining them to the persons, filling offices, occupying positions or engaged inr pursuits,- at the time of their enrolment. In some cases the persons exempted must have been employed in the duties of their office ©5 profession, at the date of the act, and could not entitle themselves to an exemption by subsequently engaging in such office or profession, even prior to the time of their enrolment. This is the case -with regard to ministers of •Religion, physicians and. school-masters.
All the farmers oí the country are put into the army except the bonded overseers of fifteen able-bodied field hands, and even they, it seems, might have been deprived 'of the benefit of this exemption had they been enrolled since the 1st of February,-1864, but for a special provision-in their favor. See 4th par. of the 10th sec.' of the act of February, 1864. Looking, then, over the whole act, from the first section to the last, I am unable to discover anything, either in its language or spirit, which releases or exempts from service any person already in the army as a soldier. The fact that, by another act of Congress, offi- *116 ecrs and soldiers in the army may. become exempt from' further service by being elected to certain offices or places of trust, either in the State or Confederate government, does not affect the present -.case, which depends, in the view in which I am now looking at it, entirely upon the construction of the act of February, 1864.
2d. The second position taken for the petitioner by hia counsel, is a much more important one, affecting as it does the relative powers and rights of the Confederate and State governments ; and, I therefore, approach it# discussion with much diffidence, particularly as I find that the conclusion at which I have arrived, k ut variance with, the opinion entertained by many of those, for whose learning and ability 1 entertain the highest'respect. The difficulties of the case arise from the fact, that .the same persons are citizens of two separate and distinct sovereigns, to both of which they owe duty and allegiance. If the constitutions, upon which their respective governments are based, he rightly construed, and rigidly adhered to,, there -will be little or no danger of their .clashing, or interfering with each other in their respective.demanils of service from .the people. In the distribution of the powers of sovereignty, it is conceded that the States have conferred upon the Confederate government the war power, that is, the power to declare war, and tp raise and support armies. 'It has been held lu all the greatest statesmen and judges of the. country, that this power is,' with a slight exception, unlimited. In aid of this and'the other powers, vested in the general government, the Constitution declares, that Congress shall have power “ to make all laws which shall be necessary and proper for carrying them into execution.. See Art. 1*, sec. 8, par. .18. And it asserts the supremacy of the Confederate. States, *117 as to the powers conferred upon -the - government, by declaring that “ this Constitution, and the laws of the Confederate-States made in pursuance thereof, shall be the supreme law of the land and the Judges in every State shall'be bound thereby, anything in the Constitution ®r laws of any .State to the contrary, notwithstanding.” Although the'war power of the Confedérate government is thus absolute and unlimited in ternas, and the supremacy of that government over the States, with regard to that power, is thus clearly and distinctly asserted, it has been decided, and I think rightly decided, that the Confederate government cannot, in the exorcise of the war power, destroy the States, by conscribing those officers, who are necessary to the action of the State'governments. See Burroughs vs. Peyton, decided by the Supreme Ceurt of Appeals of Virginia, and recognized as authority in Johnson vs. Mallett,decided by tins Court. Whatever persons filled any office-in the State, which the Legislature declared to be necessary for the State government, when the act of February 1864,was passed,were thereby placed beyond the power of conscription, by the'Confederate government. That government is founded upon the State governments as sovereigns, and eannot exist without them. The superstructure must fall when its pijlars are taken away or destroyed. • ■
But the case is reversed when the' Confederate government has, in the exercise of its rightful supreme war power, conscribed into its service a man who is not an officer of tbe State, and the State is attempting to take him. out of it,' by electing him to an office. . The man,, as a citizen, owed the duty to the general, government, which it had called upon' him to perform, just, as .much as he owed the duty to the State, to accept and discharge ’the *118 duties, to which he' was elected. 'Here are two obligations undoubtedly binding upon the man,- but which being inconsistent, cannot both be performed at the same time. How can this conflict be settled, but by resorting to a principle of potent efficacy'both in'international arid municipal law, that priority of possession -gives priority -of. right? This would seem to be a just rule,'even if the' two governments were equal in their powers with respect to the subject; and it surely cannot operate against that government whose power, in that particular, is supreme.
The State must-,' in -such a case, yield to the prior claim of the general government, and select some other man to fill its office; The argument that perhaps the State cannot find another person out of the army fit for the place, is answered by the equally probable supposition that 'the general government may net he able to procure another fit person for a soldier. When either supposition shall become certainty, it will he when both governments are on the eve of destruction.
• The petitiener, in the present ease, is not one of the officers of the State who is recognized in its Constitution as being essential to the government. If he were so the argument in his favor would be much stronger, perhaps irresistible. The' Constitution . declares, in express or .necessarily implied terms, that there shall he a-Governor, Judges of the Supreme. Court;, Justices of the Reace, a Sheriff, a Coroner or Coroners and Constables in each county; a Secretary of State and' several other officers; also members, of both houses of the General Assembly ; and it may he that with regard to all these the. State never surrendered the right to have the officés and places filled by any of her citizens, whether they should he, at the time of their election, in the service of the general *119 government or not. This is a question of the highest importance to both governments, and I will not- undertake to decide upon it until it becomes necessary,' in the performance of my judicial duty, to do sq. It may also deserve more consideration than .the subject has yet received, whether the Legislature can deprive the State of any ©f these constitutional officers by. permitting them to be conscribed/as it purports to do as to some of them, by the act of December 14th, 1863. See laws _of _ the extra session in Dec., 1863, ch. 14th.
My conclusion, upon a full, consideration of the whole matter, is that the judgment which I rendered in vacation, in favor of the petitioner, founded, as I expressed-at the time, upon the previous case of Russell vs. Whiting, decided by the Chief Justice, was erroneous, and ought t@ be reversed, with costs ; and that the petitioner must be remanded to the custody of Major Peter Mallett, Com: mandant of Conscripts. . .
Manly, J., concurred.